UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
                                                     :

JEFFREY MULLEN et al., *individually and on behalf of*   :
*all others similarly situated*,                           :
                                                     :

                        Plaintiff,            :                23-CV-1394 (JMF)
                                                     :

            -v-                              :          OPINION AND ORDER
                                                     :

TERRAN ORBITAL OPERATING CORP. et al.,       :
                                                   :

                        Defendant.         :
                                                   :
-----------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

       This case arises from a merger between Terran Orbital Operating Corp. (formerly known

as Terran Orbital Corp.) and Tailwind Two Acquisition Corp. ("Tailwind"), a special purpose

acquisition company or "SPAC."  Lead Plaintiffs Jeffrey Mullen, Justin Carnahan, Thomas

Bennett, and Robert Irwin — all former employees of Terran Orbital Operating Corp. ("Terran

Orbital") who held shares of the old company's common stock that were eventually converted

into the merged company's common stock — allege that they consented to the merger based on

false and misleading information and that delays in the delivery of their converted shares caused

them to lose money.  They filed this purported class action on behalf of all those similarly

situated, bringing claims for federal securities fraud under Sections 11 and 15 of the Securities

Act of 1933, 15 U.S.C. § 77k against Tailwind and several of its directors and officers; wrongful

refusal of certificated stocks under Section 158 of Delaware General Corporation Law, Del.

Code Ann. tit. 8. § 158, against Tailwind; breach of fiduciary duty against Terran Orbital and

several of its directors and officers; and aiding-and-abetting that breach of fiduciary duty against

Tailwind, its officers, and its sponsor, Tailwind Two Sponsor LLC ("Tailwind Two").

Defendants now move, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss the case. *See* ECF No. 22. For the reasons that follow, Defendants' motion is GRANTED and the Amended Complaint is DISMISSED.

## BACKGROUND

The following facts are taken from the Amended Complaint, ECF No. 27 ("Compl."); documents referenced or attached thereto, most notably the Agreement and Plan of Merger ("Merger Agreement") for the merger at issue, ECF No. 54-3 ("Form S-4/Merger Agreement"); and documents of which the Court may take judicial notice, such as filings with the Securities and Exchange Commission ("SEC"). *See, e.g.*, *Tang Cap. Partners, LP v. BRC Inc.*, No. 22-CV-3476 (RWL), 2023 WL 2396635, at *5 (S.D.N.Y. Mar. 8, 2023); *Hensley v. IEC Elecs. Corp.*, No. 13-CV-4507 (JMF), 2014 WL 4473373, at *1 (S.D.N.Y. Sept. 11, 2014). The allegations in the Amended Complaint are assumed to be true and construed in the light most favorable to Plaintiffs. *See, e.g.*, *Kleinman v. Elan Corp., PLC*, 706 F.3d 145, 152 (2d Cir. 2013).

## A. SPACs and Terran Orbital

Terran Orbital is a satellite manufacturer founded in 2013 by Defendant Marc Bell. Compl. ¶ 41. The company does most of its business with the federal government. *Id.* Plaintiffs joined Terran Orbital, in "technical roles as engineers and other esoteric highly skilled positions," when the company was "a struggling startup in a cutthroat industry." *Id.* ¶ 42. They took "significant risks" by joining a startup in a nascent field and accepted "relatively low wages" supplemented by stock options. *Id.* Over time, Plaintiffs exercised their stock options in the hopes that "if [Terran Orbital] were to someday go public . . . they would be able to sell their shares in the open market at their discretion." *Id.* ¶ 43. Ultimately, Mullen held four certificates representing 3,500 shares of common stock in Terran Orbital, *id.* ¶ 26; Irwin held two stock

certificates representing 2,687 shares, *id.*; Carnahan held two certificates representing 5,000 shares, *id.* ¶ 27; and Bennett held one certificate representing 1,250 shares, *id.* ¶ 28.

In 2021, Terran Orbital saw a "financial year loss of $139 million." *Id.* ¶ 45.  In other words, it was "in need for capital." *Id.* ¶ 46.  Around the same time, SPACs became a prominent and "viable alternative to the traditional" initial public offering — or IPO — "process." *Id.*  A SPAC is a publicly traded company that "holds one asset," which is cash from investors who purchase its shares, and "has one purpose," which is to identify and merge with a non-public "target company." *Id.* ¶¶ 47-48.  Through that "de-SPAC" transaction, the target company becomes a public company without undergoing the traditional IPO process. *Id.* ¶¶ 2, 46, 49.  On or about October 28, 2021, Terran Orbital announced that it had reached a deal to go public by merging with Tailwind, a SPAC, a transaction that would bring an infusion of capital. *Id.* ¶ 53.  In connection with its own IPO, Tailwind had raised about $345 million, $330 million of which was subject to a pre-merger redemption. *Id.* ¶ 54.  The merger was also supported by $50.8 million in private placement in public equity ("PIPE") investment, which was provided in exchange for 5,080,409 shares of common stock in the new company. *Id.* ¶ 56.  The merger deal was estimated to give Terran Orbital a $1.3 billion valuation. *Id.* ¶ 55.

## B.  The Terms of the Merger

The Merger Agreement included several conditions, including Plaintiffs' and other Terran Orbital shareholders' consent, and a debt limit of $40 million for the merged entity. *Id.* ¶¶ 59, 85(d); *see also* Form S-4/Merger Agreement 540-41.[1]  It also provided that, at the "Effective Time" — that is, upon the filing of the Certificate of Merger with the Delaware

---

[1]    Citations to the Form S-4/Merger Agreement are to the page numbers automatically generated by the Court's electronic case filing ("ECF") system.

Secretary of State — shares in Terran Orbital common stock would be "automatically converted into the right to receive a number of shares" in the merged company according to an exchange ratio.  Compl. ¶¶ 75, 77, 79; Form S-4/Merger Agreement 489.  Finally, as relevant here, the Merger Agreement provided that any "Dissenting Stockholder" could demand appraisal rights under Section 262 of the Delaware General Corporation Law ("DGCL").  *Id.* at 494; *see also id.* at 545 ("This [Merger] Agreement, and all claims or causes of action based upon, arising out of, or related to this Agreement or the transactions contemplated hereby, shall be governed by, and construed in accordance with, the internal substantive Laws of the State of Delaware.").

On February 10, 2022, Tailwind filed its Form S-4, which became effective on February 14, 2022.  *Id.* ¶ 57.  The Form S-4 registered 182,739,883 shares, of which 116,584,883 were "slated for issuance to Plaintiffs and other [] Terran common stockholders in connection with the merger at an exchange ratio of 27.704 shares" of the post-merger company for each share of common stock in Terran Orbital.  *Id.*  Like the Merger Agreement, the "Questions and Answers" section of the Form S-4 identified several conditions for the merger, including, as relevant here: the consent of Terran Orbital shareholders; net tangible assets of at least $5,000,001 "after giving effect" to various financing agreements; the $40 million "Net Debt Condition"; approval by the New York Stock Exchange or Nasdaq of the initial listing application; and the effectiveness of the registration statement.  *Id.* ¶ 76.  But significantly, Tailwind included the following in a bullet-point summary included in the Form S-4: "Either Tailwind [] or Terran Orbital may waive one or more of the conditions to the [merger] or certain of the other transactions contemplated by" the Merger Agreement.  Form S-4/Merger Agreement 77.

The Form S-4 further provided that Tailwind shareholders could redeem their Class A ordinary shares for cash upon consummation of the merger.  Form S-4/Merger Agreement 212.

It explained that while Tailwind did not have a "specified maximum redemption threshold," it would not redeem shares in an amount that would cause its net tangible assets to be less than $5,000,001.  *Id* at 144.  Any such redemption would also be subject to the Net Debt Condition. Indeed, as set forth in the Form S-4, an 85% redemption rate was the maximum "that may occur" and "still satisfy" that condition.  *Id.* at 248-49; *see* Compl. ¶¶ 85(b), (d), (f).  Finally, as relevant here, the Form S-4 provided that Tailwind would pay the PIPE investors a "quarterly fee of $1.875 million for sixteen (16) quarters beginning at the end of the first quarter following" the merger in exchange for an additional $30 million investment.  *See id.* ¶ 85(c); Form S-4/Merger Agreement 335.  The document warned that shareholders in the merged company "will experience immediate dilution as a consequence of the issuance of New Terran Orbital Common Stock as consideration in the [merger], the PIPE Financing and the Debt Financings."  *Id.* at 142; *cf.* Compl. ¶ 81.

In March 2022, Tailwind and Terran Orbital agreed to waive or add several conditions to the merger.  On March 9, 2022, the Merger Agreement was amended to delete the Net Debt Condition and to add the condition that Tailwind's shareholders shall not elect to redeem more than 85% of their outstanding Class A shares.  *See id.* ¶ 85(d); ECF No. 54-6 (relevant Form 8-K).  On March 25, 2022, the day that the transaction closed, the Merger Agreement was amended once again to delete that new condition.  *See* Compl. ¶ 85(d); ECF No. 54-8 (relevant Form 8-K). On the same day, Beach Point Capital, a PIPE investor, agreed to exchange some of Terran Orbital's debt for 2,400,000 shares of common stock in the merged company.  *See* Compl. ¶ 85(e); ECF No. 54-12 (relevant Form 10-Q).

**C.  Plaintiffs' Consent and Post-Merger Events**

On February 15, 2022, Plaintiffs and other shareholders of Terran Orbital received a notice (the "Consent Solicitation") soliciting their written consent to the merger.  *Id.* ¶¶ 60-61; *see* ECF No. 54-4 ("Consent Solicitation").  The Consent Solicitation provided Plaintiffs with an online link to "material information regarding the Transaction," which led to Tailwind's Form S-4 and the Merger Agreement.  Compl. ¶¶ 60, 61.  The Consent Solicitation instructed Terran Orbital's shareholders to "not date the signature page" so that Terran Orbital could "hold [the] signature page in escrow until the Effective Time."  *Id.* ¶¶ 61-62.  The Consent Solicitation itself neither mentioned Plaintiffs' appraisal rights nor informed them that consenting to the merger would result in loss of their appraisal rights.  *Id.* ¶ 70.

Shareholders of both Terran Orbital and Tailwind then voted to approve the merger.  *Id.* ¶¶ 72, 89; *see also* ECF No. 54-11.  On March 25, 2022, the transaction closed, and a Certificate of Merger was filed with the Delaware Secretary of State.  *See* ECF No. 54-12 ("Form 10-Q"), at 9.[2]  On March 28, 2022, the merged company's shares began trading on the New York Stock Exchange under the symbol "LLAP."  Compl. ¶ 92.  Tailwind stockholders, including venture capital funds that held a large number of shares, "immediately liquidate[d] their entire [] position" in the merged company.  *Id.* ¶¶ 22-23.  Ultimately, redemptions totaled $316.7 million (with Tailwind shareholders redeeming each share for $10.28 cash), a figure that exceeded the Form S-4's estimate that redemptions would total $293.3 million in a maximum redemption scenario.  *Id.* ¶¶ 85(d), 93.

---

[2]    The Amended Complaint alleges that the Certificate of Merger was filed on March 28, 2022, *see* Compl. ¶ 77, but that is contradicted by the filing, of which the Court can and does take judicial notice.

As a result of the merger, all outstanding common stock in Terran Orbital was converted into common stock in the merged company. *Id.* ¶ 90. But Plaintiffs' and other Terran Orbital shareholders' stock "was not eligible for trading until April 4th at the earliest." *Id.* ¶¶ 19, 92. On March 29, 2022, Carnahan found out for the first time that his shares were not subject to a lock-up and that the process of "setting up accounts for all existing Terran shareholders" would "require a multi-step process involving Continental Stock Transfer & Trust Company." *Id.* ¶ 83. This was different from what Carnahan had been told on February 28, 2022, by a Terran Orbital officer, who had explained that "Terran will use a TBD broker to set up accounts for all existing Terran shareholders" and that, "[o]nce the deal closes, the accounts will hold the public company share for each Terran shareholder and transfer once a 6 month lock-up period is over." *Id.* ¶ 82. On April 1, 2022, Plaintiffs and other Terran Orbital shareholders received an email from Continental Stock Transfer & Trust Company ("Continental") attaching their "book entry confirmation[s]." *Id.* ¶ 94.

By that date, which marked the end of the first week of trading, LLAP shares were trading at $7.33 per share, meaning "over 26.7% . . . of value had been wiped" since the beginning of the week. *Id.* ¶ 20. Plaintiffs were able to begin trading their shares on April 5, 2022. *Id.* ¶¶ 19, 99. By that time, LLAP shares were trading at around $6 per share. *Id.* Plaintiffs estimate that Terran Orbital shareholders lost approximately "$15-20+ million" because they could not sell their stock at the beginning of the trading period. *Id.* ¶ 20. They also estimate that they would have received "an appraisal award of a minimum of $7 per share" had they had the opportunity to seek appraisal. *Id.* ¶ 21.

**D.  Plaintiffs' Claims and Procedural Background**

In the operative Amended Complaint, Plaintiffs bring claims against Terran Orbital, several Terran Orbital Directors (namely, Marc Bell, Daniel Staton, James LaChance, and Stratton Sclavos, collectively referred to as the "Terran Orbital Director Defendants"), Tailwind, Tailwind Two, and several Tailwind Directors (namely, Michael Eby, Philip Krim, Tommy Stadlen, Wisdom Lu, Boris Revsin, Chris Hollod, and Michael Kim, collectively referred to as the "Tailwind Director Defendants"), on behalf of "all record and beneficial holders of [Terran Orbital] common stock who (a) signed the consent solicitations to approve the Merger and (b) who received their [post-merger] common stock . . . issued from the materially false and misleading [Form] S-4 and subsequent Form 425s." *Id.* ¶ 100.  Specifically, they bring: (1) a claim for violation of Section 11(a) of the Securities Act against Tailwind and the Tailwind Director Defendants, *see id.* ¶¶ 85, 110-16, and a related claim for controlling person liability under Section 15 of the Securities Act against Tailwind Two, *see id.* ¶¶ 85, 117; (2) a claim for wrongful refusal to issue stock certificates in violation of Title 8, Delaware Code Annotated, Section 158 against Tailwind, *see id.* ¶¶ 122-29; (3) a claim for breach of fiduciary duty against Terral Orbital and the Terran Orbital Director Defendants, *see id.* ¶¶ 130-32; and (4) a claim for aiding and abetting a breach of fiduciary duty against Tailwind and the Tailwind Director Defendants, *see id.* ¶¶ 133-36.  Plaintiffs allege jurisdiction pursuant to both 28 U.S.C. § 1331 and the Class Action Fairness Act, 28 U.S.C. § 1332(d).  *See id.* ¶ 39.

## LEGAL STANDARDS

In evaluating a motion to dismiss pursuant to Rule 12(b)(6), a court must accept all facts set forth in the complaint as true and draw all reasonable inferences in the plaintiff's favor.  *See, e.g.*, *Empire Merchs., LLC v. Reliable Churchill LLLP*, 902 F.3d 132, 139 (2d Cir. 2018); *Burch*

*v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 124 (2d Cir. 2008).  A plaintiff's claims will survive a motion to dismiss, however, only if it alleges facts sufficient "to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).  Thus, a plaintiff must show "more than a sheer possibility that [the defendant] has acted unlawfully," *id.*, and cannot rely on mere "labels and conclusions" to support a claim, *Twombly*, 550 U.S. at 555.  If a plaintiff's pleadings "have not nudged [its] claims across the line from conceivable to plausible, [those claims] must be dismissed."  *Id.* at 570.

## DISCUSSION

Defendants move to dismiss all four claims in the Amended Complaint.  The Court will consider each of their arguments in turn.

### A.  Count I: Violation of Section 11 of the Securities Act

Section 11(a) provides that any signatory to a registration statement, director of the issuer, or underwriter may be held liable to purchasers of registered securities if the registration statement contains "an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading."  15 U.S.C. § 77k(a); *see Tongue v. Sanofi*, 816 F.3d 199, 209 (2d Cir. 2016).  To state a claim under Section 11, a plaintiff must allege that "(1) she purchased a registered security, either directly from the issuer or in the aftermarket following the offering; (2) the defendant participated in the offering in a manner sufficient to give rise to liability under section 11; and (3) the registration statement 'contained an untrue statement of a material fact or omitted to state a material fact

required to be stated therein or necessary to make the statements therein not misleading.'" *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 358-59 (2d Cir. 2010) (quoting 15 U.S.C. § 77k(a)).  Significantly, "[i]n determining whether the statements contained in a [registration statement] are materially misleading, the [registration statement] must be read as a whole." *In re AMF Bowling Sec. Litig.*, No. 99-CV-3023 (DC), 2001 WL 286758, at *4 (S.D.N.Y. Mar. 23, 2001).  Moreover, "courts considering Section 11 . . . claims at the motion to dismiss stage inquire into the 'truth of a statement made in the registration statement' as 'judged by the facts as they existed when the registration statement became effective.'" *Winter v. Stronghold Digital Mining, Inc.*, No. 22-CV-3088 (RA), 2023 WL 5152177, at *7 (S.D.N.Y. Aug. 10, 2023).

In Count I, Plaintiffs allege that Tailwind and the Tailwind Director Defendants — i.e., the directors "who signed the Registration Statement," Compl. ¶¶ 30, 38 (capitalization altered); *see also* Form S-4/Merger Agreement 758 — violated Section 11 by issuing a Form S-4 that was (or later became) "materially false and misleading" in eight ways, Compl. ¶ 85.  Plaintiffs also bring a related claim against Tailwind Two for "controlling person" liability under Section 15, which depends on a showing of primary liability for a Section 11 claim.  *See, e.g.*, *In re Morgan Stanley*, 592 F.3d at 358.  For the following reasons, the Court concludes that none of the alleged deficiencies are sufficient to state a claim under Section 11 or, by extension, Section 15.[3]

---

[3]    At the outset, Defendants ask the Court to dismiss Plaintiffs' Section 11 claim for lack of statutory standing.  Section 11 provides a private right of action to those who "acquired" securities pursuant to a false or misleading registration statement.  15 U.S.C. § 77k(a).  Relying primarily on *In re Carlotz, Inc. Securities Litigation*, 667 F. Supp. 3d 71 (S.D.N.Y. 2023), which also concerned securities offered in connection with a de-SPAC transaction, Defendants argue that Plaintiffs do not fit this category because they do not allege that they purchased their shares in the merged company pursuant to the Form S-4.  *See* Defs.' Mem. 8-9.  *Carlotz*, however, is distinguishable on the ground that there, the plaintiff "*admit*[*ted*] that [he] did not purchase his [] shares pursuant to the S-4 registration statement being challenged" and that "he purchased them *before* any securities were offered pursuant to the merger."  *In re Carlotz*, 667 F. Supp. 3d at 81 (emphases added).  Here, Plaintiffs make no such concession.  In any case, the regulatory

### 1. Allegations Regarding the Redemption Rate

Plaintiffs' principal argument — which underlies several of the alleged misstatements — is that their stock suffered higher-than-expected dilution because redemption rates surpassed the figures provided in the Form S-4.  *See* Compl. ¶¶ 85(a), (b), (d), (f).  First, Plaintiffs allege that the Form S-4 was misleading because it "represented that there was a maximum redemption condition of 85%," yet "the ultimate redemption rate was over 95%," *id.* ¶ 85(b).  As Defendants point out, however, the Form S-4 plainly disclosed, in a bullet-point list of risk factors, that "Tailwind [] does not have a specified maximum redemption threshold."  Form S-4/Merger Agreement 144; *see* ECF No. 53 ("Defs.' Mem."), at 12.  The Form S-4 therefore does not make the representation — let alone misrepresentation — that Plaintiffs allege.  Furthermore, while the Form S-4 did state that an 85% redemption rate is the maximum "that may occur" and "still satisfy" the Net Debt Condition, it also informed Plaintiffs that the parties to the Merger Agreement could waive that condition, which is what happened.  Form S-4/Merger Agreement 77, 171.[4]

Second, along similar lines, Plaintiffs take issue with the fact that the Form S-4 estimated the merged company's minimum "cash to balance sheet" — that is, the figure it would be in a maximum redemption scenario — to be $179.1 million when in fact it was only $76.6 million.

---

landscape has changed in several (likely material) ways since the *Carlotz* decision.  In February 2024, for example, the SEC adopted a rule deeming any business combination transactions involving a SPAC to be a sale of securities, arguably bringing registration statements for de-SPAC transactions under the ambit of Section 11.  *See generally* 89 Fed. Reg. 14158 (Feb. 26, 2024).  Thus, the Court assumes without deciding that Plaintiffs have statutory standing and proceeds to the merits.  *See Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 103 (2d Cir. 2011).

[4]     Notably, Plaintiffs all but acknowledge that the Form S-4's use of the 85% figure did not represent a guarantee of any kind when they also allege that Tailwind and the Tailwind Director Defendants failed to apprise them of the subsequent addition (then deletion) of an 85% cap on redemptions.  *See id.* ¶ 85(d).

*Id.* ¶ 85(a); *see* Form S-4/Merger Agreement 68.  This allegation falls short for the same reasons.

Indeed, Plaintiffs themselves acknowledge that the $179.1 million figure did not represent a

guarantee.  Instead, it was an estimate contingent on an assumption of a maximum redemption

rate, which, as discussed above, referred to the redemption level "that may occur but [] would

still satisfy" a waivable debt-limit condition.  *See, e.g.*, *Zirkin v. Quanta Cap. Holdings*, No. 07-

CV-851 (RPP), 2009 WL 185940, at *10-11 (S.D.N.Y. Jan. 23, 2009) (dismissing a Section 11

claim based on a "$68.5 million loss estimate" that turned out to be wrong).  And while the Form

S-4 did specify that the "Maximum Redemption" scenario for the purposes of that calculation

was one in which "29,325,000 Tailwind Two Class A Ordinary Shares" were redeemed, the

same chart reiterated on the next page that the redemption numbers "[a]ssume[d] the maximum

number of Tailwind Two Class A Ordinary Shares that can be redeemed, while still satisfying

the Net Debt Condition."  Form S-4/Merger Agreement 68-69.  A reasonable investor, knowing

that the Net Debt Condition was subject to waiver, would thus not have mistaken the Form S-4's

$179.1 million estimate as a guarantee of a minimum "cash to balance sheet" number.  *See, e.g.*,

*In re TVIX Sec. Litig.*, 25 F. Supp. 3d 444, 454-55 (S.D.N.Y. 2014) (concluding that

"hypothetical examples" did not form the basis of a valid Section 11 claim).

Finally, Plaintiffs allege that Tailwind and the Tailwind Director Defendants failed to

"mak[e] any Form 425 explanatory disclosure" to notify Plaintiffs that the Merger Agreement

was amended to delete the Net Debt Condition and add an 85% redemption cap, and then

amended once more to delete that redemption cap, Compl. ¶ 85(d), and failed to disclose that

"far more than 85%" of Tailwind's shareholders had redeemed their Tailwind stock on the

scheduled redemption date, *id.* ¶ 85(f).  These claims fail because the Amended Complaint does

not allege that the Form S-4 omitted facts that "both existed, and were known or knowable, *at*

*the time of the offering*."  *Scott v. Gen. Motors Co.*, 46 F. Supp. 3d 387, 394, 396 (S.D.N.Y.

2014) (emphasis added).  That is, the facts at issue arose after the Form S-4's February 14, 2022

effective date.  In any event, the facts were actually disclosed in Form 425 prospectuses and

Form 8-Ks.  *See, e.g.*, ECF No. 54-6, at 4 (disclosing waiver of the Net Debt Condition); ECF

No. 54-8, at 3 (disclosing waiver of the Tailwind redemption limit).

        Grasping for straws, Plaintiffs contend that each of those filings "restart[ed] the clock on

[their] Section 11 claims," pushing the relevant effective date to March 28, 2022, the date of

Defendants' last Form 8-K filing.  ECF No. 63 ("Pls.' Opp'n"), 13.  But that does nothing to

address the second point that the facts were actually disclosed.  Moreover, the one and only case

Plaintiffs offer to support that contention — *Federal Housing Financial Agency v. HSBC North*

*American Holdings, Inc.*, 987 F. Supp. 2d 369, 374 (S.D.N.Y. 2013) — is inapposite.  It

concerns a registrant's obligations as to "securities registered 'for the shelf,'" which have "no

relevance to claims concerning securities offered pursuant to the initial registration statement."

*Finkel v. Stratton Corp.*, 962 F.2d 169, 174 (2d Cir. 1992).  As Defendants discuss in their reply

brief, material disclosures that follow a shelf registration statement may reset the statute of

limitation for Section 11 claims because the shelf registration process, unlike the registration

process for securities offered pursuant to a merger, "allows certain would-be issuers to file a

generic registration statement with the SEC that omits the type of detailed information that must

generally be disclosed to purchasers."  *Fed. Hous. Fin. Agency*, 987 F. Supp. 2d at 373; ECF No.

64 ("Defs.' Reply"), at 2.  Outside of that context, however, the Second Circuit has "not

establish[ed] an affirmative duty to amend a registration statement."  *In re All. Pharm. Corp.*

*Secs. Litig.*, 279 F. Supp. 2d 171, 184-85 (S.D.N.Y. 2003); *cf. SEC v. Manor Nursing Ctrs., Inc.*,

458 F.2d 1082, 1099 n.24 (2d Cir. 1972) (declining to reach "the question whether the

registration statement speaks only as of its effective date"). Because Defendants' Form 425 and Form 8-K disclosures of the changes regarding the Net Debt Condition and the redemption cap did not retroactively render the Form S-4 deficient, Plaintiffs' allegations regarding those changes are insufficient to state a Section 11 claim.

**2. Allegations Regarding Tailwind's Financing and Stock Conversion**

The rest of Plaintiffs' Section 11 allegations concern the changes to, and implications of, Tailwind's financing scheme and the process for exchanging Terran Orbital common stock for Tailwind shares following the merger. To begin, Plaintiffs allege that the Form S-4 failed to "disclose or fully explain" the dilutive effects of "the fact that of the $50.8 [million in] PIPE financing . . . , $30 million of that financing was to be returned to PIPE investors over 16 quarters at the rate of $1.875 million per quarter even though [those same] PIPE investors . . . would still receive their [Tailwind] shares." Compl. ¶ 85(c). But this allegation is flatly contradicted by the Form S-4, which disclosed not only that the "PIPE Investor or its affiliate will [] receive a quarterly fee of $1.875 million for sixteen (16) quarters," but also that these payments would be "in addition to the shares to be received by" the investor. Form S-4/Merger Agreement 172. Furthermore, the Form S-4 even disclosed that Plaintiffs will "experience immediate dilution as a consequence" of issuing those shares "as consideration in . . . the PIPE Financing." *Id.* at 142. The Form S-4 therefore does not make the omission that Plaintiffs allege it does.

Plaintiffs' remaining allegations concern Beach Point Capital's March 25, 2022 agreement to swap some of Terran Orbital's debt for an additional 2,400,000 shares in the merged company, *see* Compl. ¶¶ 85(e), (g), and "the protracted process that Plaintiffs . . . would need to endure to get their freely tradeable New Terran stock," *id.* ¶ 14, *see id.* ¶¶ 75-78. As

discussed above, however, Plaintiffs do not allege that these facts "were known or knowable, *at the time of the offering*," *Scott*, 46 F. Supp. 3d at 394 (emphasis added), and Tailwind's Form 10-Q disclosure of the Beach Point agreement did not reset the Form S-4's effective date or otherwise trigger a duty to amend the Form S-4.  The allegations are therefore insufficient to state a Section 11 claim.

*        *        *        *

In sum, none of the Form S-4's alleged deficiencies are sufficient to state a claim for violation of Section 11, so the claim must be and is dismissed.[5]  It follows that Plaintiff's claim for controlling person liability under Section 15 must be and is also dismissed.  *See In re Morgan Stanley*, 592 F.3d at 358.

## B.  Count II: Violation of DGCL Section 158

Next, Plaintiffs claim that Tailwind refused to provide them with shares of the merged company's common stock in certificate form in violation of Section 158 of the DGCL, which "prevent[ed] them from selling the shares at a time and price of their choosing."  Compl. ¶¶ 125, 128.  Under Section 158 of the DGCL, "every holder of stock represented by certificates shall be entitled to have a certificate signed by, or in the name of, the corporation by any 2 authorized officers of the corporation representing the number of shares registered in certificate form."  Del. Code Ann. tit. 8, § 158.  But Plaintiffs were not "holder[s] of stock represented by certificates" within the meaning of Section 158.  Section 158 expressly allows a corporation's board to "provide by resolution" that "some or all of" the corporation's stock "shall be *uncertificated* shares," *id.* (emphasis added), and the Merger Agreement provided that the shares to be provided

---

[5]    In light of that conclusion, the Court need not and does not reach Defendants' argument that Plaintiffs' Section 11 claim fails for failure to allege loss causation.  *See* Defs.' Mem. 15.

15

to Plaintiffs were to be "in book-entry" (that is, uncertificated) "form," Form S-4/Merger

Agreement 493.  Plaintiffs do not dispute that their shares in the merged company were

uncertificated.  Instead, they contend that it is enough that their shares in Terran Orbital — i.e.,

the pre-merger company — were certificated.  *See* Pls.' Opp'n 18.  But Plaintiffs do not cite, and

the Court has not found, any authority to support the proposition that having certificated shares

prior to conversion entitled Plaintiffs to certificated shares after the conversion.  Accordingly,

their claim under DGCL Section 158 fails as a matter of law and must be dismissed.

**C.  Counts III and IV: Breach of Fiduciary Duty and Aiding and Abetting the Same**

Plaintiffs' final claims are for breach of fiduciary duty and aiding and abetting the same.

Specifically, they allege that Terran Orbital and the Terran Orbital Director Defendants (Bell,

Staton, LaChance, and Sclavos) breached their fiduciary duties to Plaintiffs by failing to "deal in

good faith with [Terran Orbital] shareholders and make full and fair disclosure of all material

facts to Plaintiffs . . . in connection with the Consent Solicitation and issuance" of shares in the

merged company.  Compl. ¶ 130.  And they allege that Tailwind, the Tailwind Director

Defendants, and Tailwind Two aided and abetted the Terran Orbital Director Defendants' breach

of fiduciary duty "by failing to cause the [Form] S-4 to inform Plaintiffs . . . of all material facts

and fail[ing] to issue share certificates."  *Id.* ¶ 135.

Plaintiffs concede that the breach of fiduciary duty claim fails as to Terran Orbital, *see*

Pls.' Opp'n 19, because an issuing corporation "owes no fiduciary duty" to its stockholders,

*Alessi v. Beracha*, 849 A.2d 939, 950 (Del. Ch. 2004).  But it also fails more generally.  As

Defendants point out, *see* Defs.' Mem. 17-18, Terran Orbital's Certificate of Incorporation, of

which the Court takes judicial notice, *see Staehr v. Mack*, No. 07-CV-10368, 2011 WL 1330856,

at *6 n.5 (S.D.N.Y. Mar. 31, 2011), exculpates Terran Orbital's directors from liability "for

monetary damages for breach of fiduciary duty as a director," ECF No. 54-1, at 3-4.  Delaware

law permits such elimination of personal liability "provided that such provision shall not

eliminate or limit" liability for "breach of the director's or officer's duty of loyalty to the

corporation or its stockholders" or for "acts or omissions not in good faith or which involve

intentional misconduct or a knowing violation of law."  Del. Code Ann. tit. 8, § 102(b)(7).  In

other words, exculpatory provisions like the one in Terran Orbital's Certificate of Incorporation,

while allowed under Delaware law, do not protect directors from allegations that they "harbored

self-interest adverse to the stockholders' interests, acted to advance the self-interest of an

interested party from whom they could not be presumed to act independently, or acted in bad

faith."  *In re Cornerstone Therapeutics, Inc.*, 115 A.3d 1173, 1180 (Del. 2015).

Plaintiffs argue that their claim for breach of fiduciary duty fits within these exceptions

because the alleged failures to disclose "and other fiduciary breaches are 'inextricably

intertwined with issues of loyalty' in light of the fact that [Terran Orbital's] directors were

promoting a Merger that favored [Tailwind]."  Pls.' Opp'n 21 (quoting *Emerald Partners v.

Berlin*, 787 A.2d 85, 93 (Del. 2001)).  But the Court disagrees.  For one thing, Plaintiffs fail to

overcome the presumption, required under Delaware Law, that Terran Orbital's directors "acted

on an informed basis, in good faith and in the honest belief that the action taken was in the best

interests of the company."  *Orman v. Cullman*, 794 A.2d 5, 19-20 (Del. Ch. 2002).  Because "[a]

cardinal precept of the General Corporation Law of the State of Delaware is that directors, rather

than shareholders, manage the business and affairs of the corporation," this so-called business

judgment rule presumptively applies to claims for breach of the fiduciary duty of loyalty.  *In re

KKR Fin. Holdings LLC S'holder Litig.*, 101 A.3d 980, 989 (Del. Ch. 2014).  A plaintiff can

"rebut the business judgment presumption" by showing, for example, that a defendant "stands on

both sides of a transaction" or that "at least half of the directors who approved the transaction were not disinterested or independent." *Id.* at 990.  But Plaintiffs offer no such allegations here. Their conclusory allegation that the Terran Orbital Director Defendants "acted to advance their own self-interest and self-interest of [Tailwind] and [Tailwind Two] at the expense of Plaintiffs and the class," Compl. ¶ 73, does not come close to carrying their burden, *see Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 362 (Del. 1993).  Thus, the Court may not "second-guess[]" the decisions made by Terran Orbital's officers.  *Orman*, 794 A.2d at 20.

Under the "deferential" business judgment rule, none of Plaintiffs' allegations are sufficient to state a non-exculpated claim for breach of fiduciary duty.  *Tornetta v. Musk*, 250 A.3d 793, 797 (Del. Ch. 2019).  First, Plaintiffs allege that the Terran Orbital Director Defendants "breached fiduciary duties by soliciting shareholder action through materially false and misleading consent solicitation," Compl. ¶ 131(a); "failing to provide information . . . changes in terms of the merger [the] terms of the merger agreement occurring in March 2022 which worked a financial disadvantage on Plaintiffs and the class," *id.* ¶ 131(g); and "failing to require issuance of [stock] certificates . . . to Plaintiffs and the Class on the Effective Date," *id.* ¶ 131(c).  But, as discussed above, the Consent Solicitation was not misleading or false, Plaintiffs were not entitled to post-effective-date amendments beyond Tailwind's public disclosures, and Tailwind was not required to issue certificates to Plaintiffs under Delaware law.[6] Thus, and because Plaintiffs offer no other allegations to suggest that "no rational person could

---

[6] Additionally, insofar as Plaintiffs' claim bears on the allegedly misleading Consent Solicitation, the relevant disclosure documents were prepared by Tailwind, not Terran Orbital. *See* Defs.' Mem. 25; Defs.' Reply 7; *cf. Zirn v. VLI Corp.*, No. 9488, 1989 WL 79963, at *11 (Del. Ch. July 17, 1989) ("Because [the defendant] had no responsibility for the quality or completeness of [the buyer's] disclosure documents, [the court] must dismiss [the claim] to the extent it seeks to hold it liable for alleged misrepresentations or omissions.").

have believed that" the Terran Orbital Director Defendants' "decisions relating to the Merger were made with a business purpose," these allegations are insufficient to support a claim for breach of fiduciary duty. *Se. Penn. Transp. Auth. v. Volgenau*, No. 6354-VCN, 2013 WL 4009193, at *21-22 (Del. Ch. Aug. 5, 2013); *see also In re GM (Hughes) S'holder Litig.*, No. 20269, 2005 WL 1089021, at *13-15 (Del. Ch. May 4, 2005) (dismissing a breach of fiduciary claim based on a failure to disclose after finding that the Consent Solicitation did, in fact, make the relevant disclosures).

Next, Plaintiffs make several overlapping allegations regarding their appraisal rights and the revocability of their consents. Specifically, they allege that the Terran Orbital Director Defendants breached their fiduciary duties of loyalty by "failing to give the required statutory notice of appraisal rights to Plaintiff and the class," Compl. ¶ 131(b); "failing to allow the revocation of Plaintiffs['] and class members['] consents," *id.* ¶ 131(f); and "disloyally preferring the interests of [Tailwind] and [Tailwind Two] by failing to allow revocation of consents and by inducing Plaintiffs and the class to forfeit their appraisal rights by consenting to the Merger without the benefit of full and fair disclosure of all material facts," *id.* ¶ 131(h). Puzzlingly, however, Plaintiffs also acknowledge that Bell did, in fact, "sen[d] a 'Confidential Notice of Action by Written Consent, Merger and Appraisal Right' dated April 1, 2022." *Id.* ¶ 72. Contrary to Plaintiffs' insistence that the Consent Solicitation was nevertheless "not in compliance with Delaware law . . . because there was no disclosure of appraisal rights," Pls.' Opp'n 22, Delaware law requires only that shareholders be given notice of their appraisal rights within ten days of the closing date — which, in this case, was March 28, 2022 — where a merger is approved by written consent, *see* Del. Code Ann. tit. 8, § 262. And in any case, Plaintiffs do not offer any authority in support of their apparent contention that failure to provide notice of

appraisal rights constitutes a breach of the duty of loyalty rather than a breach of the duty of care, for which the Terran Orbital Director Defendants would be exculpated. *See In re Cyan, Inc. S'holders Litig.*, No. 11027-CB, 2017 WL 1956955, at *18 (Del. Ch. May 11, 2017) (dismissing a claim for breach of fiduciary duty based on a failure to provide notice of appraisal rights after deeming it an improper attempt to end-run an exculpatory provision in the certificate of incorporation).  Finally, Plaintiffs' bald contention that "failing to allow revocation of consents" is a breach of fiduciary duty is belied by Delaware law, which does not prohibit irrevocable consent solicitations. *See* Del. Code Ann. tit. 8, § 228(c) ("*Unless otherwise provided*, any such consent shall be revocable prior to its becoming effective." (emphasis added)); *DiRienzo v. Lichtenstein*, No. 7094-VCP, 2013 WL 5503034, at *15 (Del. Ch. Sept. 30, 2013) (dismissing a claim for breach of fiduciary duty based on an allegation that Defendants took an action that Delaware law expressly permits).

Plaintiffs' remaining allegations are that the Terran Orbital Director Defendants breached the fiduciary duty of loyalty by "failing to inform Plaintiffs and the Class of the protracted process" for stock conversion following the merger, Compl. ¶ 131(d), and by "failing to structure the process to preclude [Tailwind] shareholders from getting a 'head start' over Plaintiffs and the class in selling their [] shares," *id.* ¶ 131(e).  These allegations are also insufficient to state a claim for breach of fiduciary duty because Plaintiffs do not offer any additional allegations from which the Court can reasonably infer that any of Terran Orbital's officers knew about the "protracted process" or the alleged "head start" or, if they did, that they kept the information from Plaintiffs and other Terran Orbital shareholders out of self-interest or in bad faith.  *See In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106, 134-35 (Del. Ch. 2009) (dismissing a

claim for breach of fiduciary duty because the plaintiffs had "not alleged particular facts showing that the director defendants were even aware of any misstatements or omissions").

In sum, Plaintiffs do not plausibly allege either an unexculpated breach of the duty of loyalty or that any of Defendants' alleged actions or omissions reflected an abuse of discretion sufficient to overcome the deference owed to their business judgments. Accordingly, their claim for breach of fiduciary duty must be and is dismissed. It follows that the aiding-and-abetting claim also fails as a matter of law. *See, e.g.*, *Teachers' Ret. Sys. v. Aidinoff*, 900 A.2d 654, 671 n.23 (Del. Ch. 2006) (affirming that, in order to state a claim for aiding and abetting a breach of fiduciary duty, a plaintiff must allege a breach in the first instance).

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is GRANTED. Further, the Court declines to *sua sponte* grant Plaintiffs leave to amend. To be sure, leave to amend a pleading should be freely given "when justice so requires." Fed. R. Civ. P. 15(a)(2). But it is "within the sound discretion of the district court to grant or deny leave to amend," *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007), and there are several reasons to exercise that discretion to deny leave here. First, the problems with Plaintiffs' dismissed claims are substantive, so amendment would be futile. *See, e.g.*, *Roundtree v. N.Y.C.*, No. 19-CV-2475 (JMF), 2021 WL 1667193, at *6 (S.D.N.Y. Apr. 28, 2021) (citing cases). Second, Plaintiffs do not request leave to amend or suggest that it is in possession of facts that would cure the problems with the dismissed claims. *See, e.g.*, *Clark v. Kitt*, No. 12-CV-8061 (CS), 2014 WL 4054284, at *15 (S.D.N.Y. Aug. 15, 2014) ("A plaintiff need not be given leave to amend if [it] fails to specify how amendment would cure the pleading deficiencies in [its] complaint."); *accord TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505-06 (2d Cir. 2014). Finally, the

Court granted Plaintiffs leave to amend its original complaint in response to Defendants' motion to dismiss, which raised the defects in the dismissed claims discussed above, and explicitly warned that Plaintiffs would "not be given any further opportunity to amend the complaint to address issues raised by the motion to dismiss."  ECF No. 18.  Plaintiffs' "failure to fix deficiencies in [their] previous pleadings is alone sufficient ground to deny leave to amend *sua sponte*."  *Transeo S.A.R.L. v. Bessemer Venture Partners VI L.P.*, 936 F. Supp. 2d 376, 415 (S.D.N.Y. 2013) (citing cases).

The Clerk of Court is directed to terminate ECF No. 52, to enter judgment for Defendants consistent with this Opinion and Order, and to close this case.

SO ORDERED.

Dated: July 26, 2024
       New York, New York

_____
JESSE M. FURMAN
United States District Judge